[Nos. 40534-2-II; 40636-5-II.   Division Two.   May 1, 2012.]

THE STATE OF WASHINGTON, *Respondent*, v. TIMOTHY J. DOBBS, *Appellant*.

*In the Matter of the Personal Restraint of* TIMOTHY J. DOBBS, *Petitioner*.

906

*Timothy J. Dobbs*, pro se.

*Eric J. Nielsen* (of *Nielsen, Broman & Koch PLLC*), for appellant/petitioner.

*Susan I. Bauer, Prosecuting Attorney*, and *James Smith, Deputy*, for respondent.

¶1 WORSWICK, A.C.J. — Timothy J. Dobbs appeals multiple felony convictions,[1] claiming that the trial court erred by admitting the statements of a missing witness under the doctrine of forfeiture by wrongdoing. Dobbs argues that (1) the doctrine did not apply in his case and (2) even if the doctrine applied, the State was required to show that a hearsay exception applied as a prerequisite to the admissibility of the victim's statements. In a statement of additional grounds and a personal restraint petition, Dobbs challenges the sufficiency of the evidence. We affirm his convictions and deny his petition.

---

[1] The trial court convicted Dobbs of stalking—domestic violence with a deadly weapon enhancement; felony harassment—domestic violence; intimidating a witness—domestic violence; drive by shooting—domestic violence; first degree unlawful possession of a firearm; and obstructing a law enforcement officer.

## FACTS

¶2 In 2009, Dobbs was involved in a tumultuous relationship with C.R. On November 7, 2009, Longview Police Officer Matthew Headley responded to a domestic violence report at 4:48 AM in response to C.R.'s call from her garage apartment. There, Officer Headley spoke with C.R., who told him that her ex-boyfriend had just been there and had slashed the tires on her car. She explained that he had come to her home and beat on the door asking to be let in. She did not let him in and they argued through the door until he eventually left, after which she heard a hissing noise and found her car tires flat. She identified Timothy Dobbs as her ex-boyfriend. A later investigation revealed puncture marks on the tires.

¶3 C.R. expressed her fear of Dobbs, explaining that he had been following her the past few days and that he was carrying a weapon. She said that he had threatened to shoot her if she would not be his girl friend anymore. While Officer Headley was speaking with C.R., she received text messages and a telephone call from Dobbs. During that telephone call, Dobbs told her, "I warned you not to call the police." 1 Report of Proceedings (RP) at 98. After she repeatedly asked him not to call her anymore, he said, "You're going to get it," and hung up. 1 RP at 98. C.R. then told Officer Headley that Dobbs had previously threatened to "shoot up" the house and everyone in it.

¶4 On November 10, 2009, Officer Nicholas Woodard responded to a call to C.R.'s residence. C.R. complained that Dobbs was still stalking her but that he had fled when the police arrived. She was hysterical and she implored Officer Woodard to find Dobbs, saying that if they did not, the police would find her dead. C.R. showed Officer Woodard a note that she said Dobbs had left her. It read:

Last days. The countdown on your . . . ass. You should know me by now, [C.R.]. You [f***ed] up and tripped with . . . the wrong

brother. You will regret what has—what you did and said to me. You never loved me. You never cared about me and now you will reap a world of trouble and pain. Number 1, you can apologize to me and talk with me face-to-face or Number 2, you know you can't and won't be (inaudible) here in Longview or Washington. I'm going all out on this with you. You're [f***ed up, b***ch].[2]

1 RP at 120. On the back of the note was the letter "D" followed by spaces and then the phrase "is on you, [b***ch]." 1 RP at 120.

¶5 Later that day, James Applebury, who lived in the home adjacent to C.R.'s garage apartment, saw a black man, who appeared to him to be Dobbs, leave in a black car. A minute or so later, he heard gunshots in the alley, looked out the window, and saw a black man getting into his car. Applebury thought it was the same man he had just seen leaving. Applebury called the police.

¶6 That evening, Applebury was home when C.R. ran into his house, screaming, "He's got a gun." 1 RP at 42-43. Applebury could see Dobbs in C.R.'s apartment holding a gun in his hand while talking with C.R.'s sister. When someone stated that Dobbs was leaving, Applebury looked out and saw Dobbs going over a fence into the neighbor's yard.

¶7 Applebury's wife, Sarah Ellis, was sitting on the porch when she saw Dobbs arrive. She went inside to tell her husband and when she came back outside, Dobbs was in C.R.'s apartment. Minutes later, C.R. ran into their house and yelled, "He's here. He's here. He has a gun." 1 RP at 72.

¶8 Officer Woodard responded to Applebury's call and saw Dobbs fleeing. Officer Woodard yelled for Dobbs to stop but Dobbs ran between the houses, over the fence, down the alley, and disappeared. Using a police dog, Officer Timothy Deisher tracked Dobbs to a Laundromat and arrested him.

---

[2] Dobbs did not designate this note as part of the record on appeal. Officer Woodard read it at trial.

¶9 Officer Woodard interviewed C.R. again on November 11. During that interview, she played two telephone messages that Dobbs had left on her phone. One was from November 10 and the other was from after his arrest. During the first, Dobbs said, "You heard that. That was me and that's what I can do." 1 RP at 123. C.R. understood this to be referring to the bullets Dobbs shot into her home. In the second phone call, which originated from the jail, Dobbs pleaded with her not to go forward with the charges and threatened to harm her if she did.

¶10 C.R. also showed Officer Woodard two text messages Dobbs had sent her. The first said, "Next time it is you, [b***ch]. On, Bloods." 1 RP at 126. The other said, "[B***ch], you move and there will be hell to pay. Plus, my bro lives down there and he's a known figure. You can't get away from me. I told you you're mines [sic]." 1 RP at 126-27.

¶11 Sergeant Michael Hallowell retrieved a revolver from Ken Norton, Applebury's neighbor, who testified that he found it in his backyard the morning of November 11. Sergeant Hallowell also interviewed Dobbs. Dobbs told him that the gun he had with him at C.R.'s was a toy gun and he denied slashing C.R.'s car tires. Dobbs explained that C.R. had a lot of enemies and that any one of them could have done it.

¶12 Dobbs waived his right to a jury trial. On the first day of Dobbs's trial, the State explained that it had subpoenaed C.R. to appear at 10:30 AM but that she was not there. Because the State had served the subpoena, the trial court issued a material witness arrest warrant. Officer Headley later testified that he had contacted C.R. at her home the prior night and had reminded her to be in court at 9:00 AM. C.R. responded, "Okay" and then closed the door. 1 RP at 105-06.

¶13 On the second day of trial, Sergeant Hallowell testified about his efforts to contact C.R. the previous night and before trial. Sergeant Hallowell contacted C.R.'s acquaintances, had other police officers go to her home twice,

and personally went to her home twice; once was before trial that morning.

¶14 The State argued that Dobbs's misconduct was the reason C.R. did not appear to testify and that Dobbs had forfeited his right to challenge the admission of her statements as inadmissible hearsay. Dobbs argued that the State had presented no evidence that C.R. did not show up because she was afraid. Further it argued that the State had not shown sufficient foundation to admit the note, the text messages, and the telephone calls.

¶15 The trial court ruled:

> Clear, cogent and convincing evidence. I'm satisfied that there is a sufficient basis that the defendant's conduct is the fact to why she is not here. There is testimony that she felt he was—the defendant was following her. She knew he carried a weapon. Others had seen a black handgun. She had threatened to—he had threatened to shoot her in the past, if she wouldn't let him be her boyfriend. She said she was receiving text messages calling her names. There is evidence that—I'm deciding this by clear, cogent and convincing evidence. I have not decided this case based upon beyond a reasonable doubt. So, that should be emphasized. There is the—she believed it was the defendant that punctured her tires. She said she believed the defendant would—he would hurt her because of what she had said in the—because of what he had said in the past, she believed he would shoot her. He had a handgun. So, I think that based upon the evidence that is in front of this Court, it is clear, cogent and convincing that she was afraid of him and that's why she isn't here to testify. And, that based on that evidence, he does forfeit the right to object on the confrontation issues, not as to the basis for any hearsay.

2 RP at 255-56. After further discussion, the trial court ruled:

> Well, considering the *Fallentine*[3] decision, which I think is the—it's a critical decision. It's based on a Supreme Court

---

[3] *State v. Fallentine*, 149 Wn. App. 614, 215 P.3d 945 (2009).

decision of *Mason*,[4] and, it talks about reflexive forfeiture being a legitimate basis for the—the concept of forfeiture by wrongdoing. And, this case is—has a stronger basis than I think the *Fallentine* decision.

And then, you get to footnote 34 that says that there is also a waiver of hearsay objections if the Court finds forfeiture by wrongdoing. I think it resolves the issue with a broad brush.

I will make specific findings. I don't find that these are excited utterances. I don't think they meet the level. There is some nervousness, there is some anxiety. There is not—not—she is not hysterical. So, I don't think it rises to the level of trustworthiness that you would necessarily find as that exception to the hearsay rule. And, all the exceptions do require that if you are looking at exceptions to the hearsay rule, which apparently, under *Fallentine*, we're not.

2 RP at 282.

¶16 The trial court found Dobbs guilty of stalking, felony harassment, intimidating a witness, drive-by shooting, unlawful possession of a firearm, and obstructing law enforcement. It found him not guilty of second degree assault and first degree burglary.

## DISCUSSION

### I. FORFEITURE BY WRONGDOING

■■ ¶17 The doctrine of forfeiture by wrongdoing holds that a criminal defendant waives his Sixth Amendment confrontation rights if the defendant is responsible for the witness's absence at trial. *Mason*, 160 Wn.2d at 924. Once the State shows that the defendant's conduct is the reason for the witness's absence, the State may introduce the witness's out-of-court statements. *Mason*, 160 Wn.2d at 924. To apply this doctrine, the State must prove the causal link between the defendant's conduct and the witness's

---

[4] *State v. Mason*, 160 Wn.2d 910, 162 P.3d 396 (2007), *cert. denied*, 553 U.S. 1035 (2008).

absence by clear, cogent, and convincing evidence. *Mason*, 160 Wn.2d at 926-27.

¶18 Dobbs argues that the trial court erred in applying the doctrine of forfeiture by wrongdoing because the State failed to present direct evidence that Dobbs procured C.R.'s unavailability or establish any causal link between his alleged malfeasance and her absence at trial. We disagree.

¶19 Dobbs argues that (1) the trial court, in applying the doctrine, should have considered only actions Dobbs took after the State initiated criminal proceedings; (2) the State did not prove by clear, cogent, and convincing evidence that Dobbs's actions were designed to prevent C.R. from testifying at his trial; and (3) the State failed to present any evidence that Dobbs's threats were the reason she did not testify. Additionally, Dobbs suggests that the reason C.R. did not testify is because she may have resumed her relationship with him and posits that domestic violence victims often return to their abusers.

¶20 We review the trial court's finding that Dobbs's actions were intended to keep C.R. from testifying against him for substantial evidence in the record that could reasonably be found to be clear, cogent, and convincing. *State v. Fallentine*, 149 Wn. App. 614, 620-21, 215 P.3d 945 (2009) (citing *In re Det. of LaBelle*, 107 Wn.2d 196, 209, 728 P.2d 138 (1986)).

A. *Prior Acts*

¶21 Dobbs argues that the trial court could consider only those actions he took after the State initiated criminal proceedings. We disagree.

¶22 There is no rule that the trial court may consider only acts occurring after the defendant is charged in deciding whether the forfeiture doctrine applies. Dobbs cites no such case and the Supreme Court suggests that the trial court can consider prior events:

> Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct

designed to prevent testimony to police officers or cooperation in criminal prosecutions. Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution—rendering her prior statements admissible under the forfeiture doctrine. Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify.

*Giles v. California*, 554 U.S. 353, 377, 128 S. Ct. 2678, 171 L. Ed. 2d 488 (2008). Dobbs's argument fails.

## B. *Evidence of Wrongdoing*

¶23 Dobbs argues that the State did not prove that his actions were designed to prevent C.R. from testifying. We disagree.

¶24 Here, the evidence showed that Dobbs engaged in repeated and persistent acts of violence against C.R. and that his violence escalated as time progressed. First there were verbal threats and arguing; then tire slashing; then a drive-by shooting; and, finally, he entered her apartment without permission while wielding a gun. Dobbs's text messages, telephone calls, and note showed that he was not afraid of the police, that he told C.R. she would die if she continued to cooperate with them, and that his friends would "reap a world of trouble and pain" on her. 1 RP at 120. Even after his arrest, he pleaded with her not to press charges, and then threatened her, saying, "[Y]ou'll regret it." 1 RP at 123. This is substantial evidence that Dobbs intentionally engaged in misconduct to keep C.R. from testifying. The trial court did not err in finding that the doctrine of forfeiture by misconduct applied.

## C. *Reflexive Forfeiture*

¶25 Dobbs argues that applying the forfeiture doctrine in cases such as this results in "reflexive forfeiture."

Br. of Appellant at 15. "Reflexive forfeiture" offends the presumption of innocence because the trial court must assume the defendant is guilty prior to trial. *Mason*, 160 Wn.2d at 940 (Sanders, J., dissenting). He argues that our Supreme Court adopted reflexive forfeiture in *Mason* because that was a murder case and the act of murder will always be the reason the victim is unavailable to testify. Extending the forfeiture doctrine to domestic violence cases, he argues, "could cause a situation in which anyone charged with an act of domestic violence forfeits his or her right to confrontation by virtue of the nature of the act alone." Br. of Appellant at 17 (citing Tom Lininger, *Yes, Virginia, There Is a Confrontation Clause*, 71 BROOKLYN L. REV. 401, 407 (2005) ("[T]he forfeiture exception would swallow the rule of confrontation.")).

¶26 Dobbs's concerns about reflexive forfeiture are not present in this case. Here, we have evidence that Dobbs's violent behavior became more aggressive because of C.R.'s cooperation with the police; this includes evidence of his behavior after his incarceration. There is sufficient evidence to show that Dobbs caused C.R.'s unavailability. The trial court did not err in applying the doctrine of forfeiture by wrongdoing.

## II. HEARSAY

¶27 Dobbs argues that even if the doctrine of forfeiture by wrongdoing applied, the trial court erred in ruling that it need not find hearsay exceptions that applied to C.R.'s statements before admitting them at trial. He relies on ER 804(a)(6), which provides, "A declarant is not unavailable as a witness if the . . . absence is due to the procurement or wrongdoing of the proponent of a statement for the purpose of preventing the witness from attending or testifying." He argues that once a witness is deemed unavailable under this rule, the exceptions under ER 803 apply to determine admissibility.

¶28 He notes that the trial court and the State agreed that certain evidence would have been inadmissible but for the doctrine of forfeiture by wrongdoing. This evidence consisted of two handwritten statements C.R. made that would have been arguably admissible only if they contradicted her in-court testimony, and numerous statements C.R. gave that did not qualify under the hearsay exceptions for present sense impressions and excited utterances. *See State v. Nelson*, 74 Wn. App. 380, 387, 874 P.2d 170 (1994) (discussing reliability factors for assessing prior inconsistent statements).

¶29 In *Mason*, our Supreme Court adopted the doctrine of forfeiture by wrongdoing, explaining:

> Forfeiture is grounded in equity—the notion that people cannot complain of the natural and generally intended consequences of their actions. Specific intent to prevent testimony is unnecessary. Knowledge that the foreseeable consequences of one's actions include a witness' unavailability at trial is adequate to conclude a forfeiture of confrontation rights. The finding of a *specific* intent to keep a witness from testifying argued by Mason is more than is warranted by the "equitable" grounds upon which the rule is based.

160 Wn.2d at 926.

¶30 In *Fallentine*, Clark, a coparticipant in an arson, refused to testify against Fallentine out of fear of physical violence against himself. 149 Wn. App. at 622-23. The trial court applied the doctrine of forfeiture by wrongdoing and admitted Clark's recorded statements to the arson investigator. 149 Wn. App. at 623. In a footnote, the appellate court noted:

> Fallentine concedes that a finding of forfeiture by wrongdoing prohibits a challenge to the admissibility of statements on hearsay as well as confrontation grounds. *See Giles*, 128 S. Ct. at 2686. For the first time in his reply brief, Fallentine contends *Giles* leaves open the question of whether unreliable testimony, excludable on due process grounds, may be introduced by virtue of an accused person's act of wrongdoing. We decline to address

this argument. *See State v. Johnson,* 119 Wn.2d 167, 170, 829 P.2d 1082 (1992).

149 Wn. App. at 623-24 n.34.

¶31 In *Giles,* the Supreme Court suggested that indeed the defendant has waived any hearsay objections when the doctrine of forfeiture by wrongdoing applies:

> No case or treatise that we have found, however, suggested that a defendant who committed wrongdoing forfeited his confrontation rights but not his hearsay rights. And the distinction would have been a surprising one, because courts prior to the founding excluded hearsay evidence in large part *because* it was unconfronted. See, *e. g.*, 2 [William] Hawkins[, A Treatise on the Pleas of the Crown] 606 (6th ed. 1787); 2 M[atthew] Bacon, A New Abridgment of the Law 313 (1736). As the plurality said in *Dutton* v. *Evans,* 400 U. S. 74, 86[, 91 S. Ct. 210, 27 L. Ed. 2d 213] (1970), "[i]t seems apparent that the Sixth Amendment's Confrontation Clause and the evidentiary hearsay rule stem from the same roots."

*Giles,* 554 U.S. at 365 (last alteration in original). This is consistent with former Federal Rule of Evidence 804(b)(6) (2010), which provides that a defendant's forfeiture by wrongdoing acts as an exception to the hearsay rule.

> **(b) Hearsay exceptions.** The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
>
>  . . . .
>
> **(6) Forfeiture by wrongdoing.** A statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness.

Former FED. R. EVID. 804(b)(6).

■ ■ ¶32 "Because both the hearsay rule and the confrontation clause are designed to protect against the dangers of using out-of-court declarations as proof, a defendant's actions that make it necessary for the government to resort to such proof should be construed as a forfeiture of

the protections afforded under both." *United States v. White*, 325 U.S. App. D.C. 282, 116 F.3d 903, 912 (1997) (noting more common trend is loss of confrontation rights and hearsay objections). *But see Vasquez v. People*, 173 P.3d 1099, 1106 (Colo. 2007) (adopting the more "prudent" approach and requiring proof of reliability separately because hearsay is inherently unreliable). We hold the trial court did not err in admitting the evidence.

¶33 Dobbs next argues that under ER 804(a)(6), a "declarant is deemed not unavailable when his or her failure to testify was procured by the wrongdoing of the party objecting to the admission of the statement." Br. of Appellant at 22. But he misconstrues ER 804(a)(6), which actually states that a declarant is deemed not unavailable if the witness's failure to testify "is due to the procurement or wrongdoing of the *proponent* of a statement." (Emphasis added.) ER 804(a)(6) simply does not apply here.

¶34 Finally, Dobbs argues that the State is unjustly enriched under its theory that any hearsay objections are waived. He argues that this approach allows the State to introduce otherwise inadmissible evidence without having to make a showing of reliability. For example, C.R. gave two written statements that would have been admissible only had she testified differently than the affidavits.[5] But we agree with the State's position that Dobbs's conduct made its best evidence, namely, C.R.'s testimony, unavailable and instead it had to rely on hearsay and other less direct evidence to prove the charges.

¶35 Although there may be some statements so lacking in reliability that their admission would raise due process concerns, *see United States v. Aguiar*, 975 F.2d 45, 47 (2d Cir. 1992) (although finding no due process violation in case

---

[5] This type of victim statement is frequently referred to as a *"Smith* affidavit" based on *State v. Smith*, 97 Wn.2d 856, 861-63, 651 P.2d 207 (1982) (holding ER 801(d)(1)(i) permits admission of a trial witness's prior inconsistent statement as substantive evidence when that statement was made as a written complaint (under oath subject to penalty of perjury) to investigating police officers subject to reliability analysis).

at hand, recognizing admission of facially unreliable hearsay may raise due process concerns in some cases), here Dobbs make no such claim. We affirm the trial court's ruling that Dobbs waived any hearsay objections.

¶36 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

QUINN-BRINTNALL, J., concurs.

¶37 VAN DEREN, J. (dissenting) — I respectfully dissent. I agree with the United States Supreme Court that

[d]omestic violence is an intolerable offense that legislatures may choose to combat through many means—from increasing criminal penalties to adding resources for investigation and prosecution to funding awareness and prevention campaigns. But for that serious crime, as for others, abridging the constitutional rights of criminal defendant is not in the State's arsenal.

*Giles v. California*, 554 U.S. 353, 376, 128 S. Ct. 2678, 171 L. Ed. 2d 488 (2008).

¶38 Because the abridgment of defendant's right of confrontation in domestic violence cases should not be an option, I would hold that the State is not allowed to invoke the doctrine of forfeiture by wrongdoing in domestic violence cases without clear, cogent, and convincing evidence that the alleged victim's failure to appear in response to the State's witness subpoena was due to the defendant's actions that do not form the basis of the criminal charges against the defendant.

¶39 Evidence must be clear, cogent, and convincing that the defendant accomplished the absence of the witness.

*State v. Mason*, 160 Wn.2d 910, 927, 162 P.3d 396 (2007).[6] Here, the majority relies in part on acts that were the basis of the charges against Dobbs to find that his conduct caused the alleged victim to not appear for trial. Majority at 914. In doing so, the majority, as well as the trial court, had to assume that he was guilty of the charges, without benefit of a trial and in the absence of overwhelming and untainted evidence of those charges. I am not persuaded that admission of hearsay statements from the alleged victim regarding the charges, without more, constitutes clear, cogent, and convincing evidence that the witness did not appear at trial due to the defendant's actions.

¶40 The trial court's factual findings do not indicate that Timothy Dobbs had the specific intent to prevent the complaining witness from testifying against him. Nor could the trial court have found on the record before it that Dobbs' intended to, and did, prevent the complaining witness from testifying against him by clear, cogent, and convincing evidence sufficient to waive his United States Constitution Sixth Amendment right to confrontation.

¶41 Although the record is replete with allegations about Dobbs' conduct toward the alleged victim, the record lacks even a scintilla of evidence about why the witness actually chose to not attend trial. The night before, she responded

---

[6] *Giles* overruled *Mason* to the extent *Mason* holds that specific intent to prevent testimony need not be shown to invoke the forfeiture doctrine. *State v. Fallentine*, 149 Wn. App. 614, 620, 215 P.3d 945 (2009). I would agree that application of the forfeiture doctrine does not offend the Sixth Amendment right of confrontation in murder cases where the witness is dead and there is " 'overwhelming [and] untainted' " evidence that the defendant intended to and did procure the absence of the victim by killing him. *Mason*, 160 Wn.2d at 927 (quoting *State v. Davis*, 154 Wn.2d 291, 305, 111 P.3d 844 (2005)). In those cases, the State may offer evidence of the murder victim's fear of the defendant or evidence of a murder defendant's actions toward the murder victim that suggests the defendant's motive or means of accomplishing the victim's silence or lack of cooperation with a criminal prosecution for the defendant's earlier possibly criminal conduct toward the murder victim. *See Giles*, 554 U.S. at 377; *Mason*, 160 Wn.2d at 916-17. In *Mason*, everything the murder victim said to the police was said to four civilian witnesses whose testimony Mason did not challenge, making any confrontation clause error harmless. 160 Wn.2d at 927. That is not the case here.

to Longview Police Officer Matthew Headley's reminder about appearing at trial without any suggestion that she would not appear. The record shows only speculation about her reasons for not appearing in court, based on the pending charges and on a statement Dobbs allegedly made to her after his arrest, and after he made a telephone call from the jail. Majority at 914. This evidence, under any measure, is not clear, cogent, and convincing that Dobbs procured the witness's absence.

¶42 Because I believe that Dobbs' constitutional right to confront the witness against him has been violated by an overly expansive application of the forfeiture by wrongdoing doctrine, I respectfully dissent.

Review granted at 175 Wn.2d 1013 (2012).